The case for the morning is the United States v. Funds in the Amount of $100,000, the appeal of Marrocco. Nicholas Marrocco, Your Honor. Nicholas Marrocco and Vincent Fallon. Mr. Comey. Good morning, Your Honor. I believe this may be the first case to visit a court of appeals after a jury trial post-CAFRA, so you may be weighing in on what's been the first case that's run the whole system all the way from start to finish, even though it's been here twice before, on summary judgment and pretrial motions. We believe that improper jury instructions resulted in unfair trial. The denied spoliation instruction, the trial judge disagreed with Judge Bucklow's prior ruling, and he said, quote, the court writing on a clean slate, however, it would grant claim its motion and bar the admission of the dog alert evidence, in this case, based on the government's failure to preserve the seized currency. So he was clearly of the opinion that he was handcuffed by prior precedent called law of the case. Claimant contends that law of the case is not a set of handcuffs on a district judge when ruling on evidentiary rulings. A district judge is akin to a sea captain who has to sail the sea as the ocean gives it to him from the time the ship leaves the port until the ship arrives at the end, which is the judgment in the case. In this particular case, the first ruling by Judge Bucklow occurred at summary judgment. It occurred at a time when we were arguing over what was going to be admissible in a summary judgment matter, and this court, in an opinion I believe written by Judge Mannion, reversed the summary judgment ruling of Judge Bucklow, which then set all matters available to the district judge to re-rule based on what he was confronted with as the case went forward on remand from this court. And if I remember correctly, I could be wrong, I think Judge Mannion included a footnote in his last decision in this case which said that he was deeply troubled by the absence of the currency again being disposed of so that there could be no scientific testing of the currency by a laboratory. And so this theme seems to go throughout this case from the time that the case was in front of District Judge Bucklow all the way through to today, that we have a complete absence of science in this case, where science would have easily answered the question whether or not the dog sniff was probative. Claim it contends law of the case doesn't apply to evidentiary rulings. We rely on Menzer, which is a precedent of this circuit from 2000. Menzer holds otherwise, saying that a district judge is free to make decisions concerning matters which this court has not ruled on and this court has not locked the district court into. C40 of our brief for a collection of citations from all the other circuits that agree with this decision in Menzer. The trial judge based his entire ruling on precedent that he was handcuffed and could not go back on an interlocutory ruling. There is no case law that I can find that holds against Menzer. The Menzer rule is solid law and it's been so in this circuit. In fact, every time there's a mistrial in this building, judges revisit rulings that they made during the first trial and re-decide questions which they may decide otherwise based on what evidence is actually admitted in the second trial or actually before the court. The Supreme Court has even commented that a trial judge does have jurisdiction to change its rulings as long as there has been no decision of an appellate court locking that district judge in. So the issue of the case is what is here and not what the government argues in its brief. It takes great pains to say Judge Blocklo's ruling was eminently correct in the first instance. We contend that the issue here is was Judge Thorpe's ruling correct under the circumstances. Mr. Comey, was that issue raised in the second case? No, Your Honor, it was not. So are we confronted with waiver? No. Why is that? We're not having a waiver situation here because neither party raised it before this court. When this court sent the case back down, it reversed all the basis of the summary judgment so that we went back and then we went into a pretrial posture. So this judge, Judge Thorpe, was free to look at this matter afresh and knew based on what evidence he was going to actually hear during the course of the trial that was going to go to the jury. And if there's any question in your mind, didn't the jury note nail it? Didn't the jury get concerned about what was done with the money when you look at the jury note in this case? I mean, that becomes an issue central throughout this case from the time Judge Bucklo looked at it all the way through until I'm talking to you today and hopefully in your opinion, you know, you'll focus on the fact that everybody here seems to be concerned. That money should have gone and been sent to a crime lab and been evaluated by a scientist to determine. Mr. Comey, was it correct that Judge Bucklo, when she made her initial ruling on this question, did not have the actual Department of Justice policy on retaining currency in front of her? You nailed it. That's absolutely true. And what was the situation when Judge Thorpe addressed the issue? The policy wasn't in front of him and it wasn't slipped in until a footnote on the motion to reconsider. That's the first time that came in. And if you look at his opinion on the question, he took them to task. He took them out to the woodshed and spanked them for slipping it in at the last minute. And then he also took them to task on the question of the policy itself. And he went right through the policy and said whenever there was evidentiary value to the currency, it was to be maintained. And you know, these cases come to court when a judge could decide what to do about the currency. You know, if you maintain the currency for the judge to decide when they issue the warrant, they have to issue a warrant to seize it and so forth, the currency can be easily, with the litigants in front of the court, a claimant can come in and say, we want it sent to the CLIMAB. And there's a case here with Judge Kokoris I had where they maintained some evidence and we asked him to send it to the FBI laboratory and we got a report back. So, I mean, there's definitely the ability of a district judge to control this currency and make sure that it gets examined by a crime lab and either side can, you know, decide which crime lab they want to use. So that furthers due process of law which is enshrined in the Magna Carta all the way through our Constitution and through our court processes. Now turning back to where we are here, the policy provides on its face, if you actually look at it, for the preservation of evidence that has evidentiary value. And I've never had a court deny a request from anybody to preserve evidence. And I doubt the Department of Justice believes in not preserving evidence. I mean, it's a clear thing to do. So I'd ask you to accept Judge Starb's findings on the purported authorization to destroy evidence, because I don't think anyone's authorized anyone to destroy evidence, even under the Department of Justice policy. The jury instructions are confusing and contradictory. The claimant urged the court to give only the issues instruction, requiring a substantial connection to a drug client. That instruction tracks the statute, 18 U.S.C. 983. The court was invited to error by the government's watered down instructions, which came later. The issues instruction completely tracked the statute. It was a full briefing of the issue. The court itself drafted that instruction, not the parties, on the issues. The government then came in, and instead of dealing only with the issues instruction, which encapsulated all the issues the statute had set for the jury to decide, offered the transaction and offense instructions to water down CAFRA. This has been a continuing battle which begins when plaintiff does not have to show a specific drug transaction or doesn't have to show any drug activity. Please recall, in this case, we have no drug evidence. Zero. The stuff you're normally confronted with, wiretaps, telephone calls, meetings, people who they saw, no telephone calls to Seattle, no communications whatsoever in furtherance of a drug transaction, and on top of that, no meetings, no informants. You know, everything you see in the normal drug case that comes before you is totally absent here, and the government had 13 years before the case went to trial to produce any of this stuff, and none of it was ever produced, and they had the burden of proof. Mr. Comey, could I take you back to the spoliation issue for just a moment? Yes, sir. Our court has repeatedly said, in essence, that the adverse inference based on destruction of evidence requires somebody to find that the destruction or loss occurred in bad faith. We sometimes said deliberate, sometimes said reckless, but bad faith is required. When we're talking about jury instructions, who makes that call? The jury. And what threshold showing do you think is necessary in order to get the spoliation instruction? First, destruction of the evidence, obviously. Second, after you get to that point, the circumstances that it is destroyed. In other words, what happened, you know? Well, let me put it this way. Is it like a summary judgment question where the trial judge says, okay, could a reasonable jury infer bad faith in this case, or is it something more akin to a Federal Rule of Evidence 104 preliminary determination where the judge has a little more freedom to decide the merits? Well, I haven't thought about it in the context you cast it in, 404 context, but I have thought about it in the context that a trial judge has to be free to deal with the sea he has in front of him, and that sea is whatever is coming up in that trial. And the judge rolls with that trial as the evidence comes in from the witness stand, and so he has to be free, he or she has to be free to make that determination spontaneously during the course of the trial. But you're not saying, are you, that the judge has to be convinced, him or herself, this is definitely bad faith in order to give the spoliation instruction? No, I don't think it's the judge's call. I think it's the finder of fact. I think it's committed to the finder of fact, and the purpose of that instruction is to give them guidance as a jury as to what's necessary to reach that ultimate fact. And that's why we have the jury instruction that takes them step by step. So I hope that answers the question, but I don't think a district judge is handcuffed by these sort of things like it turned out here because Judge Thorpe, if his decision shows how adamantly he was opposed to what happened here with the destruction of the question that would ultimately be decided by the jury, and it's especially true when citizens are faced with drugless seizures. I mean, you forget the bigger picture when you start drilling down on one case, but if you look at the system-wide situation, you have citizens every day having the money taken off of them with no connection to drugs in airport terminals and railroad stations. And so, you know, isn't it better that an American jury decides what really happens than leave it up to, you know, the summary judgment question? I mean, it would seem that would be the better way. Thank you. Now, going back to the transaction and offense instruction, I was saying that they were watered down in the issues instruction by putting in those two. I want to bring to your attention that the plaintiff here relies on cases decided by the 11th Circuit back in the probable cause days. And when I ask you to view this situation longer in a longer clinical context, which we're all trained to do, this was the law on probable cause. In other words, what counted to make suspicion? Totality of the circumstances. And so when you had that type of law, a trial judge at either summary judgment, and by the way, both of those cases did not involve jury trials that they relied upon. Whether you're talking about four parcels, the in-bank opinion, or whether you're talking about the other decision by the 11th Circuit, and I think it's $243,000, each one of those were dealing with summary judgment questions where the trial judge made the decision alone. And that was the trial judge deciding that there was probable cause to proceed to shift the burden to the claimant for the claimant to prove by a preponderance of the evidence. The Henry Hyde-Cafra Act, which changed everything, shifted the burden to the government to prove by a preponderance every single element. So this is no different than a cause of action where each single element has to be proved by the government in order to prevail at the end. We're not at a probable cause determination. And if you look at the historical genesis of that particular substantial connection, it was originally part of the legislative history in the Organized Crime Act of 1978. In the argument that occurred in front of Congress, Congress decided that it had to come up into the elements section and lifted it out of the legislative history in an argument that the Department of Justice lost before the Judiciary Committee. So the whole purpose of making that substantial connection was to prevent people from having property seized and forfeited, which was not actually connected to a drug transaction. So what the government did is they succeeded in watering down by using a negative, which I don't normally see in jury instructions, saying that, you know, if claimant, they said plaintiff doesn't have to do something. Okay? Plaintiff doesn't have to do something. I don't remember a lot of jury instructions coming from the circuit relieving somebody of something to start with. And so if you actually take a look at what was said in that and the prevail, to prevail in a forfeiture action on the transaction instruction, the plaintiff is not required to establish a substantial connection to a specific unlawful controlled substance transaction that occurred at a particular time, particular place, rather plaintiff is required to prove by Congress a substantial connection. That's nothing more than throwing water on top of the issues instruction and watering it down to the point where the jury can disregard the substantial requirement that there must be a connection to some type of illicit narcotics transaction. And if you look at the jury instructions as a whole, the district judge instructed them as to what a narcotics transaction was. I mean, he gave specific instructions as to each and every element of what would be a narcotics transaction. And if we look at the offense instruction to prevail in a civil act, forfeiture action, plaintiff is not required to prove claimant committed a controlled substance offense. Well, how can you not have a specific substantial connection without some offense occurring somewhere at some time or place that's in evidence? I reserve five minutes for rebuttal. Thank you very much. I'm going to start with counsel. This case was argued five years ago to this day, May 31st, five years ago. The difference between the arguments between today and what Mr. Comey said five years ago are quite stark in contrast. The last time, he asked for a trial. The entire case was basically we have summary judgment, we raise a number of issues that deal with the fact that Judge Bucklow's decision should be reversed because we have all of this evidence that wasn't considered because we raised issues of material fact. And a trial was held in this case. They were given every opportunity in this case. The court in Funds 2, in your decision, said basically the $30,000 case where science had been examined, where the dog sniff was verified in terms of the science of it, still was there, but in an individual case like this one, the claimants were entitled to examine that evidence, to go at it, to bring up experts. So we had a trial. And every single thing, there were three things that were done in issues that were raised in the last case. One was the currency contamination theory, that all the currency is contaminated, therefore a dog sniff is worthless because you can't, a dog would hit on anything. That theory had been rejected by the $30,000 case, and in this case, their own experts refuted that theory. Their own experts acknowledged that there's no study that says that a dog hits on money. There's nothing, a dog isn't going to hit on somebody's wallet when they went to the bank to get the money, unless the money's been exposed to a large amount of drugs. Their own experts verified that, and their own experts testified to that. They also presented the testimony of, we had a dog that was, we presented the evidence about the dog's reliability. It was a well-trained dog. It was clearly that this dog had been, had logs that had verified that the dog sniffed verified its veracity and that it was effective, and all of that evidence came in in terms of proving the reliability of the dog, which is one of the issues that was at the $30,000 case. It's one of the issues in the case that came down from the Supreme Court, and in Florida versus Harris, that you had to look at the reliability of the dog, and all of that evidence came in in terms of showing what the reliability of this dog, based upon the $30,000 case that talked about the science of the reliability of the dog, plus the evidence that we presented, plus the stories that were told by the claimant when we came in. In Judge Tharp's opinion, that's after this case came in, he points out, why all the lies? There was a cascade of lies that came on in this trial. You don't hear Mr. Colby talking about it. That's what distinguishes this case. It's weird, but the guy has over $100,000. First of all, he denies he has any, and I guess, you know, my skepticism is there, but this sniff was money in a briefcase, whatever it was, which I guess seals it even more, so I assume the scent, whatever the dog hit on, is trained to know to do that, and that's, I guess, where we start. But it seems this whole case that the jury heard comes down to the constant change in the story of where the money comes from, came from, and where it's going. Otherwise, you get back to square one, you get past the dog sniff. Well, I think you had, as your opinion stated, in terms of Mr. Fallon fitting the profile of the drug courier, Mr. Fallon's stories when he was stopped, and his demeanor when he was reliably reliable, had been proofed. When they came the last time, they said, well, there's no evidence that this dog can discern between narcotics-tainted currency and regular general circulation currency. That proved to be completely wrong. There was evidence in there. If these affidavits weren't false, they were incredibly sloppy, and they presented that to this court and said, this raises an issue of material fact. This court said, we can't go be, you know, some of these things may be self-serving, they might not be corroborated, but when they went through all that evidence, all of that evidence proved to be that there was no cueing that took place. Their own experts admitted to this. Our case, we think, was sufficient and good. It became terrific once their experts that were touted to this court as being the science that was going to prove this whole case. Once their experts came on, this case became ironclad, because their own experts agreed this proved almost everything that they had contended about this, and then, you know, and proved that they completely disagreed. They backed away. They admitted that they had, there was no evidence of cueing. You know, you're talking, Your Honor, about the suitcase being sealed with the money. There was evidence that they claimed was raised, that that bag was in plain sight, that the dog handler, that the dog handler could see the bag and therefore could cue the dog. After they testified in court, after they watched everything in court, they said, got to agree, there's no evidence of cueing. That one of the experts that they had come to testify, had been offered to testify about cueing in another case, and that, and he was precluded by the court from even testifying. That was like the one of the cases that he had testified to. So he completely ended up corroborating what we had said about the dogs. The dog logs were in there, and then Mr. Morocco came to testify. Mr. Fallon, who was the individual who had the money to begin with, was present one day in court, didn't testify, wasn't called to testify, and then the other day, Mr. Morocco came in, and we had him testify in our case in chief, because we used that as evidence in terms of where this money had come from, and that he didn't have sufficient income. And then he came and testified later, and as Judge Starr's testimony says, why all the lies? On the spoliation issue, it's not true that, well, I'm not, I don't know if the policy was actually present before Judge Bucklow in response to Judge Hamilton's question, or you know, that it was there, but it was referred to by her in 2010. If you look at the decision that she made, she made a decision and said, this money was deposited pursuant to department policy. It was, and she makes reference in her decision, which was not appealed. Now, Judge Tharp was hardly, you know, this hardly was an easy street for the government in this case. He admits it. I mean, if you look at his- Mr. Oswald, let me ask you to think about the spoliation question from a slightly different context, from product liability litigation. Let's suppose we've got a driver who's injured in an accident, takes the car in for repairs, his repair shop tells him this brand new car's brakes weren't working properly. And so the shop repairs the brakes, he goes on about his business, and then a year and a half later, before the statute of limitations runs, sues the We've got cases where we dismiss such cases because the critical evidence has been disposed of by the moving party. Why is this any different? I think that it's different because of the nature of what is going on with deposited funds in these cases. There is a department policy on this that says we don't want large amounts of cash to be sitting around. In this case, Mr. Comey was not on this case to We would have held this money- How long did it take before the money was disposed of? The money was disposed of within a few days. Long before the claimants could have even asserted an interest in doing their own testing, right? We do have cases in which individuals immediately ask that the money be maintained as evidence. And actually, there's a case that we cite in the brief where the individuals ask for it to be held, and the department followed the policy, and that was upheld by the court as being part of the policy, and that was upheld as being correct. I mean, you're talking- How can that be correct, given that the policy says if the money has evidentiary value, then it shouldn't be disposed of? But how does one know that it's going to have evidentiary value? You wait and see and let the opponent- You let the opponent have a reasonable opportunity to prepare to assert such a claim, rather than doing it immediately in just a few days. I think that in terms of what is done on that policy, that we would have to hold that money forever, basically. Nobody's saying you have to hold it forever, counsel, but you need to hold it at least until you've got an opponent. You know that you're going to be going to court, right? No- You know you're going to be asserting a forfeiture claim. I know that we're going to be asserting that we're going to be filing a forfeiture claim. And that there will be people who will have a due process right to contest that claim. That they would have a right to say, yes, I do understand that somebody owns that money, and that they would have the right to assert it. It doesn't necessarily mean, your honor, that everybody's going to be asserting, everybody's going to be saying that money has value for this purpose and that that money has- Maybe not, but the government's approach to this case and this evidence says we're going to make that decision for you. You're going to be stuck with our dog sniff, or in the product liability equivalent, you're going to be stuck with only the plaintiff's expert. Right? And maybe you can cross-examine them, but it's hard to cross-examine a dog. It's impossible to cross-examine a dog, but it's not impossible to deal with the evidence and to say that that could have been- To make a request, for example, before 17 months after the forfeiture, or to say- Well, when would a request have had to have been made in this case? It would have had to have been made within the first few days of the- Within a week, right? Yes, yes, your honor. What case do you know where things move that fast? Well, we do have another case that I'm aware of that the council made an immediate request that it be held when it was seized. Somebody was fast. I am aware of it because it does happen. Why? Well, yes, but- We ordinarily leave a matter of at least some weeks or months for opposing parties to get their act together. Here's another point that I would like you to consider in terms of the way that this is. I understand what you're saying in terms of this. I don't think that it's that Mr. Comey in this case, for example, this all came up. Judge Tharp, this thing was ruled upon by Judge Bucklow, and Judge Tharp didn't like it, but Judge Tharp said this is the law of the case. I don't understand how that's the law of the case, but that's a separate question. But he did it to us as well. We had the same kind of thing, and we had to live with that. So in this case, and I understand that, I don't know that it's clear from the science that was talked about in the $30,000 case that it would even be effective in terms of the amount of time that somebody would have to prove, for example, the methyl benzoate. There was evidence in the $30,000 case, which this court adopted, which is the precedent case, which says that it dissipates within a few hours. So you would have to literally, when the dog hits on it, one might say, there is a scent that can be picked up. It's not clear that even if it had been done, Your Honor, over the weekend, and they then tested the, let's say it happens on a Friday, it's not clear that the smell is going to be there on Monday. Unless they field, I suppose one could come up with, you know, you could field test it. Now, is that something that in this case is fair to say that the government should have looked forward and said, you know, we got to field test this, we got to do that? I mean, that's, you're talking about something that happened over 15 years ago. So I don't think that the record, which, and they had the ability, they had the ability to bring in the scientific experts. They had the wide open field to say, bring in this expert and show what you would have been able to do. Show that you would have had been able to detect the drugs within, you know, that you would have been able to do it within three days, four days. There's no scientific evidence to that effect that they brought in, and they were the ones that had the ability to do that. Was there scientific evidence that if you leave this sitting around, it will dissipate? That's what I'm saying. I believe that based upon the $30,000 case, that that issue was done in that case, and you referred to it, Your Honor, I mean, in that opinion. I probably did, but I don't remember. Right, but it's talking about how long it would take to be done. And was that developed in that case? I don't remember whether I said it before or not, but it would seem when you have $100,000 and maybe this isn't possible, but you just pull out $5,000 and bag it up, someone would say, well, that's not a proper sample. Right. You either have to preserve the whole bunch, and I don't know for how long. Because in the $30,000 case, as it was discussed, part of the reason that the dog, the testimony in that case and the evidence in that case was that it's because of the amount of currency involved and the amount of drugs that is on that currency, that's why the dog alerts to large amounts of currency that are tainted by drugs. That is what produces the alert from the trained drug dog. Yeah, but see, that amount could have been accumulated over some period of time. That's correct. And only a piece of it is tainted. Right, but if it's accumulated over a period of time and it's not exposed to drugs, then the dog would not be hitting on the money, would not be alerting to the money. This dog was trained to differentiate between circulated money and uncirculated money in the instance in which the training took place. He alerted to narcotics-trained currency, he was exposed to non-narcotics-trained currency, and he was able to differentiate properly between the two, as opposed to their expert who said it looked like he had a false alert to that. Well, what the jury heard, I assume, is when it got to five different reasons, whatever it is, about what the money is for and where it's from. That kept changing. Well, and it kept changing. And that seems to be what the jury had before it, saying, well, this guy's obviously lying because he keeps changing the reasons, and not just him, but it's going to be a pizzeria or it's going to be some other investment or it's going to be whatever the several excuses were about what this money is for. Right. And that's where I guess the only thing I can see is that's what the jury used. He had to get past the dog. They're going to have to say that they had that and it was a legitimate hit, and now I guess that has to be part of it. And then it gets into all this issue about what happened, what the jury kept testifying what this money was for, and that keeps raising the suspicion, and that's when they confiscate it. Yes, and I think that the implausibility of his story and the fact that he held himself out as a relatively sophisticated person that's going to do this, that he then, as we say in the brief, decides to send money with somebody across the country on a mode of transportation he's never taken to a city that he's never been to to discuss a business that he never had. The implausibility plus combined with the fact that he was trapped in a number of lies when he testified in court, and that's why Judge Tharp went to the extraordinary position of saying, why else all the lies? And in terms of this case, I mean, Mr. Comey repeatedly talks about the crime lab, and he referred to it in the argument, and he refers to it in that jury note, as if the jury note. Mr. Comey talked about the crime lab all the time, and he talks about it today again. He never pointed out what, and back to Judge Hamilton's question kind of, in terms of what, there was no evidence from their side in terms of what that would be, and they had the ability with the experts to do so, and what would show on. So when he talks about this in his closing argument, yeah, I mean, I think the jury did have some questions as to what the crime lab would have found. Would the crime lab have found this evidence? He made it sound like that that would be the case. It's not at all clear that that is, in fact, the case. If we have no further questions, Your Honor, I ask that the case be affirmed for the district court. Thank you, Mr. Oswald. Mr. Comey? There is no evidence in the record that the menthol benthate theory, because it was barred by the district judge. Remember, we had to try the case based on the motions and limine decided by the district judge and the sua sponte decision of the district judge, that there would be no expert testimony on what the dog smelled. You may recall that was a pretrial order of the district judge, and we were all barred from going into it. So there was no testimony on that due to a pretrial motion, and he took it away from the experts when he decided pretrial that nobody could testify in front of this jury what that dog was smelling. Secondly, when you're thinking about that, by the way— Was that over your objection? No, I didn't object, of course, but the bottom line is that he decided, because the government provided no experts in the entire course of the case, zero experts in 10, 15 years, to testify to anything at trial. There was no government expert listed, and he barred the government from putting any experts on, and that's why the directed verdict issue is so hot, because at the directed verdict stage in this case, nobody had told that jury what the dog was smelling. In other words, that had been barred by the pretrial order. Secondly, they brought in a dog trainer to testify, who was not the dog trainer who trained the dog. He only knew about this generally because he trained dogs years afterwards, and so he was unable to testify as to the actual base training of this particular dog. Now, with respect to the affidavit of Stanford Angelos, which was here on the summary judgment, Mr. Angelos was a DEA chemist. He was the one who did the research back in the 70s and 80s at the direction of the director of the Department of Drug Enforcement or Justice Department, and he's the one who reported to them that dog sniffs were worthless because of the fact that the currency had been contaminated. So that affidavit is in the record, and it was up here on the summary judgment, at the time of summary judgment. The question for you, Judge Mannion, is very simple. 24 hours, that money was in the bank. That was the testimony. And also we had the agent in the case who said he put the bag in the room, the dog in the room where the sniffing took place. But we never had what was talked about in the $30,000 case, and you may recall that when the decision was made to reverse the summary judgment here in Morocco, too, the first case, $30,000, had been decided on empirical evidence. There was appointed counsel. The court asked the appointed counsel to supply the court with empirical evidence, and that's how the Ferton study creeped into the law. It wasn't tried in a district court, and so that's why it was easy for this court on the summary judgment motion to distinguish $30,000 when it reversed summary judgment here because Ferton's theory and all that had come in an empirical decision provided for in this court without the district judge hearing any witnesses or hearing any testimony. With respect to testing, our crime labs in this country routinely report forensic evidence to courts on a daily basis, and to answer your question, a crime lab can do a study in a short period of time and a district judge can enter an order, but there's no way anyone can get into court within 24 hours. I mean, that's an absolute impossibility. And even if a claimant has the ability to find a lawyer, the way this current statute is written, you're supposed to send your claim to Washington. Then once it gets to Washington, it gets referred back to the U.S. attorney in Chicago, and once it gets to the U.S. attorney in Chicago, they have so many days. So by the time a whole quarter of the calendar has passed, the case is finally getting ready to be typed up and brought into a courtroom so that the time delay is so long that there's no way a litigant could come in here except on a Rule 41 motion. And a Rule 41 motion you would have to bring in under the criminal code, I think it's G, F or G, I can't remember, it was one of the subnumbers under 41, would be the only way somebody could get into court and deal with this. And that would require filing a case, which is unconnected, and the government would come in and say, wait, Judge, we're handling a forfeiture, don't do anything until the forfeiture gets here. Because I've had that happen to me when I've come in here on 41 motions to ask a judge to return seized property, and the government comes upstairs and stands in front of the district judge and says, Judge, we're planning to file a forfeiture, let's stay this until we have a chance to file the forfeiture. So there are real problems with getting this thing done, and I think your questions, Judge Mannion, are right on point. I'm over here. Sorry. We all look alike. I'm now 69, so I'm not as fast as I used to be. But anyway, thank you for listening to me this morning. Can I just ask you a question? What does the record show, if anything, of the relationship between Mr. Morocco and Mr. Fowle? They were talking about business, going into a business. I mean, can you give me sort of a temporal sense? Have they known each other for years? They knew each other for years. They were in the pizza world. There was pizza testimony about a pizza parlor. They had some dealings together when he was working for another company. So they had a long-term relationship. Right, and no evidence that any of that relationship involved drugs or any illegal activity. I mean, you don't even have an arrest of any kind here. Although Mr. Morocco said he was impacted in his job, wasn't he, by this event? Yes, because it caused him to be set back by years. But isn't the testimony that this event occurred eight months after he left the pizza parlor? I think he was still involved in pizzas and bars. In other words, he was always at a place. He was in the industry, but not at the particular restaurant. Yeah, there was a divorce that went on that blew away the plan to buy the place. In other words, the divorce between two other people prevented him from buying in because of the argument that was in the matrimonial court. But it was your usual two buddies doing something, you know, without any evidence of any kind of wrongdoing. And Mr. Morocco was a college graduate? He was a college graduate, and he's now a real estate developer at Fort Knox. And Mr. Fallon, what's his background? Mr. Fallon does the same sort of thing with Mr. Sorbo. His educational level, does that come out? I don't remember that coming out in the case. All right. Thank you, Mr. Coleman. Thank you. Have a nice day, all of you. Thank you. Thank you, Mr. Oswald. Case is taken under advisement. Court will turn to the...